UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
2005 FEB 10 P 1:45

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| STAPLES, INC., <br> Plaintiff, <br> v. <br> BRADY GRAVETT AND <br> ORIENTAL TRADING COMPANY, INC. <br> Defendants. | Civil Action No. _____ |

### AFFIDAVIT OF LAURIE FURSE

State of South Carolina )
                              ) ss.
County of Spartanburg )

      LAURIE FURSE, being duly sworn, hereby deposes and says:

    1.     I am over eighteen years of age and understand the obligation of an oath.

    2.     I am the Marketing Director for Staples Inc.'s wholly owned subsidiary, SmileMakers, Inc. ("Smilemakers"). In that capacity, I develop the marketing strategy for SmileMakers and I am responsible for merchandising, catalog production and our web site. I have worked at SmileMakers for fourteen years and I have had that title since 2000. Prior to 2000 I had the title of Marketing Manager at SmileMakers.

    3.     I make this affidavit upon my own personal knowledge and in support of Staples' and SmileMakers' motion for a temporary restraining order and preliminary injunction against

BO1 15696386.1

Brady Gravett and Oriental Trading Company, Inc. ("OTC" and collectively "Defendants") filed simultaneously herewith.

4.  Plaintiff Staples, Inc. is a Delaware Corporation with a principal place of business in Framingham, Massachusetts. Since June 2002, SmileMakers has been a Staples subsidiary.

5.  Plaintiff SmileMakers, Inc. is a South Carolina corporation with a principal place of business in Spartanburg, South Carolina. For over 25 years, SmileMakers has supplied stickers and inexpensive toys to pediatricians, teachers, dentists, and other professionals who interact with children. Sticker sales are roughly 40 % of SmileMakers' business. The Company does so by distributing colorful catalogues and enticing buyers to its web site identified as www.SmileMakers.com. SmileMakers distinguishes itself by constantly developing new stickers and toys, and it invests significant capital in a team of researchers who stay current with popular children's trends and analyze packaging formats that are the most profitable. SmileMakers offers a wide range of products to customers around the globe.

### Gravett's Employment with SmileMakers.

6.  SmileMakers hired Gravett in September 1998, even though he did not have any prior experience in the toy, novelty and sticker industry, and did not have a college degree.

7.  Upon information and belief, prior to joining SmileMakers, Gravett worked at Party City as a retail store manager. Party City later promoted him and he became Field Assistant to the Vice-President of Operations. Gravett's main duties for Party City were setting up the merchandise in new Party City locations. He did not have any formal experience with merchandising toys, stickers and novelties before joining SmileMakers, and all of the

knowledge, experience and customer contacts in the industry that Gravett had at the time he resigned from SmileMakers, he acquired while employed by SmileMakers.

8. SmileMakers provided Gravett with extensive on-the-job training and reviewed his progress on a regular basis. During Gravett's initial training, SmileMakers introduced him to all of its vendor contacts and trained him regarding the direct mail business and SmileMakers' lucrative business to business markets. As part of his training, and to enable him to perform his job, SmileMakers also entrusted Gravett with confidential information, including trade secrets, such as: (i) the identity, requirements, creditworthiness, preferences and needs of specific customers, as well as certain customer information not publicly available; (ii) the identity of vendors, distribution channels, prices and availability of toys, novelties and stickers from specific suppliers; and (iii) pricing policies and information, financial information, merchandising, packaging, negotiating and sales strategies and other selected business information about SmileMakers not publicly available. For example, SmileMakers provided Gravett access through his computer at work to the Company's private database of confidential information concerning SmileMakers customers and suppliers, and knowledge of their buying and selling needs and practices. The database contained both Gravett's own vendor contact information he regularly used during his employment and the contact information maintained by other SmileMakers' employees. In order to perform his job, Gravett also was allowed to deal directly and repeatedly with SmileMakers' customers, vendors and suppliers.

9. From approximately November 1998 through Gravett's resignation on April 16, 2004, SmileMakers further introduced Gravett to its customers and vendors and provided him resources, using SmileMakers' goodwill, to develop customer, vendor and supplier relationships.

10. At the time of his resignation in 2003, his annual salary was $49,557, plus benefits, with the opportunity to earn a 10% bonus if the Company reached a certain performance targets.

11. When SmileMakers hired Gravett in 1998, he executed a Confidentiality and Non-Competition Agreement ("the 1998 Agreement") ( A true and correct copy of the 1998 Non-Compete Agreement is attached to the Complaint as Exhibit 1 and incorporated by reference herein). The 1998 Agreement had a confidentiality provision which provided in pertinent part:

## SECTION FOUR
## CONFIDENTIALITY

Employee agrees that all projections, estimates, lists, tax records, product information, sales figures, budgets, forecasts, personnel, accounting, tax and other financial records, and all other information concerning the business and affairs of the Employer or any customer, supplier, creditor, or shareholder of the Employer shall be secret and confidential. Such confidential information shall be considered and kept as private and privileged and will not be divulged to anyone except on authorization of the Employer. Further, upon termination of employment for any cause, Employee agrees that he will not release any such information to anyone except upon written authority of the Employer. Employee agrees that he will surrender any confidential information he may have to the Employer and will not retain copies or duplicates of said information.

The 1998 Agreement also had a non-competition provision which provided in pertinent part:

## SECTION FIVE
## COMPETITION WITH EMPLOYER

Inasmuch as the Employee is being employed in a confidential capacity and will have complete knowledge of the affairs of the Employer and of the affairs of the customers and suppliers of the Employer, the Employee agrees that:

**Employee will not solicit, seek or accept any business similar to the Employer's business from any customer of the Employer with whom Employee had any dealings within a period of one year prior to Employee's termination of employment with Employer.**

> **Employee will not become employed by any entity located in the continental United States or Canada that sells novelties, giveaways, or similar products to doctors, dentists, hospitals and related professional markets.**
>
> **Employee will not on his own behalf or on behalf of another become employed by any entity that solicits business similar to the Employer's business from any customer of the Employer with whom the Employee had any dealings or contact within a period of one year prior to the Employee's termination of employment with Employer.**
>
> This section shall only be enforceable for a period of eighteen months directly after Employee leaves the employment of Employer for any reason. Employee hereby consents and agrees that any violation of any one or more of the provisions of this covenant shall permit the Employer to seek a restraining order to prevent Employee from violating said provisions. Said restraining order shall be in addition to any and all other rights available to Employer by reason of a breach of this agreement. In the event Employer seeks to enforce the provisions of this agreement and the Employer prevails, the Employer shall be entitled to recover from the Employee reasonable attorneys' fees and costs. (emphasis added.)

12. In or about June 2002, Staples Inc. bought Medical Arts Press, Inc. and its wholly owned subsidiary, SmileMakers, Inc. On January 27, 2003, Gravett signed a new "Non-Compete and Non-Solicitation Agreement" ("the 2003 Non-Compete Agreement") as well as a separate "Proprietary and Confidential Information Agreement" ("the 2003 Confidentiality Agreement") (True and correct copies of the 2003 Non-Compete Agreement and the 2003 Confidentiality Agreement are attached to the Complaint as Exhibits 2 and 3 and incorporated by reference herein.) Those agreements, which superceded the 1998 Non-Compete Agreement between Gravett and SmileMakers, were in effect when Gravett resigned to work for OTC.

13. In consideration for his execution of the 2003 Non-Compete Agreement and the 2003 Confidentiality Agreement, Staples granted Gravett 500 stock options in Staples stock on February 1, 2003.

14. Paragraph 2 of the 2003 Non-Compete Agreement provides that:

> For all periods beginning upon the date hereof and ending one year from the date of termination of his/her employment with the Company (the "Non-compete and Non-solicitation Period"), Executive shall not:
>
> Directly or indirectly as owner, partner, joint venturer, stockholder, employee, broker, agent, principal, trustee, corporate officer, director, licensor, licensee, franchise, or in any capacity whatsoever engage in, become financially interested in, be employed by or have any business or professional connection with any business that competes with the Company, including but not limited to any business engaged in, or which plans to engage in, the sale or distribution of office products or related services, including without limitation consumable office supplies, business machines and computers, office technology, telecommunication systems and services, and/or office furniture in any country where the Company or any of its subsidiaries is then engaged in such sales or distribution; provided, however, that Executive may own any securities of any corporation which is engaged in such business and is publicly owned and traded but in an amount not to exceed at any one time one percent of any class of stock or securities of such corporation...

15. Paragraph 7 of the 2003 Non-Compete Agreement stated that in the event Gravett breached the Agreement, the non-competition and non-solicitation periods would be tolled until the breach had been duly cured.

16. The 2003 Non-Compete Agreement also states that during his employment, and for a one-year period after the termination of his employment with SmileMakers, Gravett could not:

> Solicit, hire, offer employment to, or in any manner encourage employees of the Company to leave its employ. Executive further agrees that during such period he/she shall not directly or indirectly solicit, hire, or offer employment to any former employees who were employed by the Company at any time during Executive's final six months of employment with the Company.

17. Finally, the 2003 Confidentiality Agreement contains provisions regarding non-disclosure of confidential information, including trade secrets. The confidentiality provisions prohibit Gravett from using or disclosing any of SmileMakers' confidential information, and

other business information that SmileMakers disclosed to Gravett. Specifically, the 2003 Confidentiality Agreement states, in relevant part, as follows:

> All Proprietary Information shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all rights in connection therewith. I hereby assign to the Company any rights I may have or acquire in all Proprietary Information. At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust, and not use to the detriment of the Company or for the benefit of myself or any third party, all Proprietary Information or anything relating to it without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company.

18. In both the 2003 Non-Compete Agreement and the 2003 Confidentiality Agreement, Gravett agreed that SmileMakers had the right to seek injunctive relief if he breached the covenants set forth therein and both Agreements provided that they were governed by the laws of the Commonwealth of Massachusetts. The 2003 Non-Compete Agreement also provided that Gravett would pay all of the costs (including attorney's fees) the Company incurs to enforce the Agreement.

19. Gravett's duties and responsibilities as a Merchandiser for SmileMakers included, but were not limited to: (i) attending trade shows and vendor meetings, (ii) understanding customers and their needs, (iii) understanding kids market trends, (iv) recommending and sourcing new product lines, (v) setting price points on new products to meet margin objectives, (vi) setting up and coding products accurately to facilitate ordering and tracking, (vii) recommending quantity per unit and initial order quantity, (viii) providing to the creative department the necessary information for product advertising, and (ix) proofreading new products on catalog pages to verify the code, name, description, quantity and price.

20. During his employment at SmileMakers, the Company encouraged him to establish relationships with vendors and customers and provided him with a Company credit card with which to do so. As such, Gravett established a relationship with SmileMakers' key licensed sticker vendor, Sandy Lion, and SmileMakers largest toy supplier, OTC, among others.

21. During the course of Gravett's employment at SmileMakers, SmileMakers relied on a database, developed by the Company over many years, of active and creditworthy customers and suppliers, and their buying and selling needs and practices. For instance, SmileMakers has confidential information about the identity, contact information and buying habits of certain customers as well as the identity, contact information and cost flexibility of certain vendors. Finally, SmileMakers maintains information about the best selling children's toys, novelties and stickers, and it maintains as private certain information about product pricing and packaging techniques. This information is confidential, not publicly available, and critical to SmileMakers' business.

22. Because SmileMakers' goodwill and confidential information are so important to its business, SmileMakers takes great effort to protect these assets. For example, in addition to the Company's specific policies and practices established to protect its confidential information, as consideration for being allowed to work in the lucrative position of Merchandiser, SmileMakers has for many years required all such employees to sign agreements that, among other things, prohibit them from competing with SmileMakers for a one-year period following the termination of their employment. These agreements also prohibit them from soliciting any SmileMakers customer or employee for the same period of time and from disclosing or using confidential information, including trade secrets.

23. On or about April 16, 2004, Gravett submitted his resignation to Steve Brock, SmileMakers' Marketing Manager. When he resigned, Gravett told Brock that he was dissatisfied with "the direction the Company was headed in" and he was worried about "his future salary opportunities."

24. Soon thereafter, Clift Garrett, Director of Operations at SmileMakers, learned from OTC that it had hired Gravett.

25. As soon as SmileMakers learned that Gravett was going to work for OTC, I and others, escorted Gravett to his desk to get his belongings. I then reminded Gravett of his obligations under the 2003 Non-Compete and 2003 Confidentiality Agreements, and Gravett assured me that he was going to work with OTC as a buyer. He added that he was not going to be involved with marketing decisions because he understood his obligation not to divulge SmileMakers' trade secrets. A few days later, I learned that he had been carrying large boxes out to his car prior to giving his resignation.

26. At the time that Gravett left SmileMakers to work for OTC, OTC did not offer licensed stickers in its catalogue or on its web site.

27. However, upon information and belief soon after he resigned from SmileMakers in April 2003, Gravett helped OTC develop a competing licensed sticker product, concealing his activities at OTC and the nature of his new job from SmileMakers.

28. SmileMakers' success depends in large part on its goodwill with both its customers and suppliers and its confidential information about them and its product offerings. The strong relationships that SmileMakers has developed with these accounts, as well as

SmileMakers' reputation, allow it to obtain important confidential information from its customers and suppliers, and make certain sales. In addition, SmileMakers has invested significant capital in developing packaging and marketing plans directed to certain customers based on their historical buying patterns.

### Gravett's Resignation from SmileMakers and Employment by OTC

29. Upon information and belief, while still employed by SmileMakers, Gravett was negotiating with OTC, a vendor and now a competitor of SmileMakers, on his own behalf to secure a job with OTC.

30. On April 16, 2004, Gravett resigned his employment with SmileMakers to take a job with OTC, and upon information and belief he has been performing many of the same types of duties for OTC that he performed while at SmileMakers. Upon information and belief, Gravett has shared with OTC the confidential proprietary information which SmileMakers developed concerning its licensed sticker business.

31. On or about April 30, 2004, Scott Plotnik, Senior Employment and Labor Counsel at Staples, wrote a letter to Gravett, (attached to the Complaint as Exhibit 4) reiterating the terms of Gravett's 2003 Non-Compete and 2003 Confidentiality Agreements and explaining "by taking a position with OTC, [Gravett was] in violation of the Non-Compete and Non-Solicitation Agreement and Proprietary and Confidential Information Agreement [he] signed while at SmileMakers...."

32. In response, Gravett sent a letter (attached to the Complaint as Exhibit 5) stating "I can assure you that my position at OTC will not violate the terms of any agreement I have with Staples, Inc. I can also assure you that I have no intention of soliciting SmileMakers'

employees for employment elsewhere, nor do I have any intention of using or divulging proprietary information of SmileMakers."

33.  Once again, on May 17, 2004, Cindy Westervelt, Staples' Employment and Litigation Counsel, wrote a letter to Stephen Frary, President of OTC, (attached to the Complaint as Exhibit 6) reiterating that Gravett had non-compete and non-disclosure obligations to SmileMakers and warning "we are concerned that by hiring Mr. Gravett, Oriental Trading Company intends to obtain access to SmileMakers' proprietary information in order to gain an unfair business advantage in the market." Westervelt added "SmileMakers simply will not tolerate such unlawful tactics and is prepared to pursue every available remedy to protect its rights under these agreements."

34.  In response, Robert R. Siffrin, OTC's General Counsel, wrote a letter dated May 21, 2004 (attached to the Complaint as Exhibit 7) stating, inter alia, "I can assure you that Oriental Trading Company respects the intellectual property rights and contractual rights of others and has no intention or desire to obtain any confidential or proprietary information of Staples or SmileMakers or to intefere in any way with Mr. Gravett's contractual relationship with Staples."

35.  Despite the foregoing, since leaving SmileMakers, Gravett and other OTC employees have used and exploited Gravett's knowledge of SmileMakers' confidential information and SmileMakers' goodwill to develop and merchandise a new line of licensed stickers which directly competes with SmileMakers' own sticker line. In helping OTC develop this new offering, Gravett has used and disclosed confidential information, including without limitation, SmileMakers' information on the identity, creditworthiness, buying preferences and

needs of specific SmileMakers' customers; and/or the identity, channels and pricing information of SmileMakers' suppliers; and or information regarding customer preferences, merchandising, pricing and packaging.

36. In inducing Gravett to leave SmileMakers to become employed by OTC, OTC knew of Gravett's non-competition, non-solicitation and confidentiality obligations to SmileMakers, and knew that his employment with OTC would violate these restrictive covenants to the detriment of SmileMakers.

SUBSCRIBED AND SWORN TO BY ME THIS 9th DAY OF FEBRUARY 2005, UNDER THE PAINS AND PENALTIES OF PERJURY

Laurie Furse

*/s/ Laurie Furse*

BO1 15696386.1